**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

KATHERINE RICHARDS BREWER, derivatively on behalf of REGIONS FINANCIAL CORPORATION and REGIONS BANK,

        Plaintiff,

        v.

JOHN M. TURNER, JR., MARK A. CROSSWHITE, NOOPUR DAVIS, SAMUEL A. DI PIAZZA, JR., ZHANNA GOLODRYGA, J. THOMAS HILL, JOHN D. JOHNS, JOIA M. JOHNSON, RUTH ANN MARSHALL, CHARLES D. MCCRARY, JAMES T. PROKOPANKO, LEE J. STYSLINGER, III, JOSÉ S. SUQUET, TIMOTHY VINES, ALISON RAND, CAROLYN H. BYRD, DAVID J. COOPER, SR., DON DEFOSSET, ERIC C. FAST, O.B. GRAYSON HALL, JR., SUSAN W. MATLOCK, JOHN E. MAUPIN JR., DAVID J. TURNER, JR., C. MATTHEW LUSCO, JOHN B. OWEN, and TARA A. PLIMPTON,

        Defendants, and

REGIONS FINANCIAL CORPORATION and REGIONS BANK,

        Nominal Defendants.

C.A. No. 2023-1284-KSJM

**MEMORANDUM OPINION**

Date Submitted: January 22, 2025
Date Decided: September 29, 2025

Seth D. Rigrodsky, Gina M. Serra, Herbert Mondros, RIGRODSKY LAW, P.A., Wilmington, Delaware; Timothy J. MacFall, RIGRODSKY LAW, P.A., Garden City, New York; *Counsel for Plaintiff Katherine Richards Brewer*.

Raymond J. DiCamillo, Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Elizabeth Papez, Jason J. Mendro, Thomas J. McCormac IV, Andrew D. Ferguson, Alyson M. Cox, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C.; *Counsel for Defendants John M. Turner, Jr., Mark A. Crosswhite, Noopur Davis, Samuel A. Di Piazza, Jr., Zhanna Golodryga, J. Thomas Hill, John D. Johns, Joia M. Johnson, Ruth Ann Marshall, Charles D. McCrary, James T. Prokopanko, Lee J. Styslinger, III, José S. Suquet, Timothy Vines, Alison Rand, Carolyn H. Byrd, David J. Cooper, Sr., Don DeFosset, O.B. Grayson Hall, Jr., Susan W. Matlock, John E. Maupin, Jr., David J. Turner, Jr., C. Matthew Lusco, John B. Owen, and Tara A. Plimpton and Nominal Defendants Regions Financial Corporation and Regions Bank*.

**McCORMICK, C.**

Regions Financial Corporation operates Regions Bank, a mid-sized regional bank. In 2022, the Consumer Financial Protection Bureau (the "CFPB") entered a Consent Order finding that Regions employed manipulative processing methodologies to increase overdraft fees over three years beginning August 2018. The CFPB found that Regions "was aware" that its overdraft fee practice was illegal, and "could have stopped charging these fees sooner," but "instead . . . continued to charge them for years while it pursued changes to generate alternative fee revenue that would fully offset its expected revenue loss from . . . eliminating the [overdraft fees]."[1] Regions paid $191 million under the 2022 Consent Order.

Through this derivative lawsuit, a Regions stockholder seeks to recover the $191 million paid under the 2022 Consent Order from the fiduciaries who caused the bank to adopt and continue the illegal overdraft practices. The plaintiff asserts claims against Regions directors and officers who held office during the three years of wrongdoing and who were on the board when she filed her complaint. She alleges that the defendants breached their fiduciary duties under *In re Caremark International Inc. Derivative Litigation*,[2] or intentionally pursued illegal action for profit under *In re Massey Energy Co.*,[3] by allowing Regions to charge unlawful overdraft fees. The defendants have moved to dismiss for failure to plead demand futility and failure to state a claim.

---

[1] C.A. No. 2023-1284-KSJM, Docket ("Dkt.") 1 ("Compl."), Ex. 2 ¶ 2 (2022 Consent Order).

[2] 698 A.2d 959 (Del. Ch. 1996).

[3] 2011 WL 2176479 (Del. Ch. May 31, 2011).

To demonstrate that demand was futile, the plaintiff alleges that more than half of the directors in place when the complaint was filed face a substantial likelihood of liability from the claims because they served as directors during the period of wrongdoing. As to those directors, the plaintiff's strongest theory is that the board ignored red flags concerning Regions' unlawful overdraft practices. As red flags, she identifies a draft complaint sent to Regions in November 2019 by a whistleblower, the company's former General Counsel. The whistleblower claimed that he was fired for reporting the issues that led to the $191 million payment. After receiving the whistleblower complaint, the Regions board hired a law firm to investigate the issues, but the board took no immediate action to correct the practices identified as illegal. The plaintiff adequately alleges that the directors on the board who received the whistleblower complaint consciously ignored its admonitions. It is reasonably conceivable that they intentionally continued the illegal practices to give the bank time to develop a replacement revenue source, just as the CFPB concluded. The plaintiff therefore adequately alleges that those directors face a substantial likelihood of liability. Demand is excused as futile.

The complaint states a claim against the directors who face a substantial likelihood of liability under the plaintiff's *Caremark* claim. And the inferences as to those directors apply equally to the other defendants who served on the Regions board when the red flags surfaced, so the complaint also states a claim as to them. In briefing, the plaintiff did not defend and therefore waived her claims as to the other defendants. As to them, the motion is granted.

2

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference, including documents produced to the plaintiff under Section 220 of the Delaware General Corporation Law (the "220 Documents").

### A. Regions' Overdraft Fees Policies

Regions Financial Corporation is a Delaware corporation headquartered in Birmingham, Alabama. It operates Regions Bank (with Regions Financial, "Regions" or the "Company"), an Alabama state-chartered commercial bank that is part of the Federal Reserve System. Regions provides financial services for a wide range of clients. Those services include retail and mortgage banking, commercial banking, wealth management, and investment banking. Regions operates approximately 1,700 retail branches and 2,000 ATMs across 16 states and has more than $160 billion in consolidated assets.

Overdraft fees are charged when bank customers attempt to spend or withdraw more funds from their checking accounts than available. If the financial institution pays the transaction, the consumer may incur an overdraft fee. If the financial institution rejects the transaction, the consumer may incur a non-sufficient funds fee. Financial institutions also determine in what order they process transactions. The processing methodology affects when an account balance becomes insufficient or negative.

3

In regulatory jargon, the specific fees at issue are called Authorize-Positive-Settle-Negative ("APSN") fees. For simplicity only, this decision refers to overdraft, non-sufficient funds, and APSN fees all as "overdraft fees."

From August 1, 2018 to July 14, 2021, Regions settled debits in sub-batches, posting them according to transaction types. This practice delayed posting categories of transactions. In the intervening period, other debits could post to the customer's account and reduce the available balance, leaving insufficient funds to cover the debit on the settlement date. Regions charged overdraft fees based on the funds available at the time of posting, even if the bank had previously authorized the transaction. As a result, consumers incurred fees even if they had enough money in the account when the purchase was made.

**B.    The CFPB Ramps Up Enforcement Of Overdraft Regulations.**

The CFPB has enforcement authority under the Consumer Financial Protection Act of 2010, which prohibits any "covered person" from engaging in any "unfair, deceptive, or abusive act or practice" in connection with "any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service."[4] An act or practice is "unfair" if it "causes or is likely to case [sic] substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[5] An act or practice is abusive if it "materially

---

[4] Compl. ¶ 83 (quoting 12 U.S.C. § 5531(a)).

[5] *Id.* ¶ 84 (quoting 12 U.S.C. § 5531(c)).

4

interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service" or if it takes unreasonable advantage of a consumer's: (i) lack of understanding, (ii) inability to protect its own interests, or (iii) reliance on the covered person to act in the consumer's best interests.[6]

The Consumer Financial Protection Act also prohibits any covered person from offering or providing a consumer with "any financial product or service not in conformity with Federal consumer financial law," and from "otherwise commit[ing] any act or omission in violation of a Federal consumer financial law."[7] Through this language, the Act incorporates requirements from other federal consumer financial laws.

The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce."[8] Under the Federal Trade Commission Act, unfair or deceptive acts or practices include acts or practices that "cause or are likely to cause reasonably foreseeable injury within the United States or "involve material conduct occurring within the United States."[9]

Regions must comply with both acts, which prohibit deceptive overdraft practices. Because Regions offers retail banking services, it is reasonably conceivable that overdraft practices were a central compliance risk.

---

[6] *Id*. (quoting 12 U.S.C. § 5531(d)).

[7] *Id*. ¶ 85 (quoting 12 U.S.C. § 5536(a)(1)(A)).

[8] *Id*. ¶ 87 (quoting 15 U.S.C. § 45(a)(1)).

[9] *Id*. (quoting 15 U.S.C. § 45(a)(4)(A)). The Complaint cites to the CFP Act instead of the FTC Act, which appears to be in error, but which does not affect the outcome of this decision.

In 2010, the CFPB announced publicly that it would ramp up its investigations into unfair or deceptive overdraft practices. Bank of America paid $410 million in 2011, and JPMorgan Chase paid $110 million in 2012, to settle litigation over their overdraft policies, which both banks subsequently changed for compliance. In 2013, a federal court ordered Wells Fargo to pay $203 million for affirmatively misleading a class regarding its overdraft practices.

In January 2019, the CFPB entered a Consent Order against USAA Federal Savings Bank (the "USAA Consent Order"). The CFPB found that USAA violated the Electronic Fund Transfer Act by failing to honor consumers' stop payment requests and failing to initiate and complete reasonable error resolution investigations. These practices caused consumers to receive negative balances and incur overdraft and non-sufficient fund fees.

### C. Regions' Response

Regions' business and affairs are managed under the direction of a board of directors (the "Board"). Regions' Board has both a Risk Committee and an Audit Committee. Each are responsible for monitoring risk associated with federal regulations. In 2018, Regions established a Customer Transparency Working Group to review the Company's overdraft practices.

Prompted by the USAA Consent Order, Regions' directors began discussing its overdraft policies in February 2019. The topic first arose during a February 2019 joint meeting of the Risk Committee and Board. The meeting minutes reflect that the attendees discussed both the USAA Consent Order and a Consumer Compliance Supervision Bulletin issued by the Federal Reserve in July 2018 (the "July 2018

6

Bulletin").[10] The bulletin provides guidance to banking institutions concerning unfair and deceptive overdraft practices. The bulletin lists ways for banks to identify and manage risks related to overdraft practices.

According to the meeting minutes in the 220 Documents, the attendees also compared Regions' practices to those of USAA. They further state that, before reviewing the USAA Consent Order, Regions had formed a project team to review its overdraft procedures. After the issuance of the USAA Consent Order, the Risk Committee and Board decided to expand the scope of the Consumer Transparency Working Group to address overdraft procedures.[11]

The topic arose again during an October 16, 2019 joint meeting of the Audit Committee and Risk Committee. Again, the minutes reflect that the committees discussed the USAA consent Order and the July 2018 Bulletin. During that meeting, the committees resolved to alter the Company's posting methodology to address Regions' failure to comply with the July 2018 Bulletin. The 220 Documents contain a Board presentation titled "2020–2022 Strategic Plan Risk Management," marked "Draft," among the October 2019 meeting materials.[12] The presentation is over 50 pages long. Page 4 of the presentation contains a bullet point, under the heading "Customer Focus" that states: "Customer transparency initiative will result in

---

[10] *See id.*, Ex. 8 at RF-BREWER-000446.

[11] *Id.* ¶ 15.

[12] *Id.*, Ex. 11 at RF-BREWER-002288.

changes to posting-order [sic] that must be effectively managed and communicated."[13] The rest of the presentation is redacted.

The minutes reflect that Chief Risk Officer, Defendant C. Matthew Lusco, "discussed risks related to posting order methodology and stated that Regions will recast its posting order to be more chronological and address potential noncompliance concerns based on the guidance issued [in the July 2018 Bulletin]."[14]

The July 2018 Bulletin describes itself as "new."[15] Defendants say that the bulletin was the "first of its kind."[16] And it is true that no agency had issued formal regulations addressing the overdraft practices at issue. But the substantive guidance provided in the July 2018 Bulletin was not new. The bulletin itself identified prior guidance released by the CFPB and Federal Reserve.[17] In a November 2016 webinar titled "Inter-Agency Overdraft Services Consumer Compliance Discussion," the CFPB warned that imposing overdraft fees at the time of posting constituted an unfair practice under federal regulations. And a June 2019 Federal Deposit Insurance Corporation publication titled "Consumer Compliance Supervisory Highlights" raised similar points.

---

[13] *Id.*, Ex. 11 at RF-BREWER-002291

[14] *Id.*, Ex. 6 at RF-BREWER-001757.

[15] FRB, *Consumer Compliance Bulletin* 1 (July 2018) (July 2018 Bulletin), *available at* http://tinyurl.com/3nbr2efa (last visited 9/29/25).

[16] Defs.' Opening Br. at 9.

[17] July 2018 Bulletin at 12–13 n.29.

### D. The Whistleblower Complaint

In November 2019, the Board received a draft complaint from the Company's former Deputy General Counsel, Jeffrey A. Lee (the "Lee Complaint"). Lee alleged that CEO John M. Turner viewed Lee as a person who "create[d] problems."[18] Regions promoted a female to General Counsel, not Lee, and Lee accused Regions of reverse discrimination based on gender.

Lee also alleged that Regions fired him for calling attention to Regions' illegal overdraft practice. Lee's draft complaint detailed Regions' history of violating laws and regulations related to overdraft fees. It referenced the July 2018 Bulletin. It stated that Lee tried to convince Regions to stop charging the illegal overdraft fees as early as March 2019. It also stated that the Customer Transparency Working Group was not empowered to stop the illegal overdraft practices. It further stated that Regions executives purposefully avoided changing the posting order until the Company could implement a plan that would increase Regions' overdraft fee revenue.

Regions reached a confidential, nonpublic settlement with Lee on November 15, 2019. CEO Turner alerted the Board of the settlement through a November 19, 2019 memo.[19] The minutes of the next Audit Committee meeting, held on December 17, 2019, reflect that the committee discussed the July 2018 Bulletin.

---

[18] Compl. Ex. 4 at RF-BREWER-002766.

[19] Pl.'s Answering Br., Ex. 4.

### E. The Buckley Memorandum

In response to the Lee Complaint, the Company engaged the law firm of Buckley LLP to review its overdraft practices. On December 27, 2019, Buckley sent a memorandum stating its conclusions to the Audit Committee. The version of this memorandum produced with the 220 Documents is largely redacted.[20] The July 21, 2020 Risk Committee meeting minutes and the materials for the July 21, 2020 Audit Committee meeting reference Buckley's engagement and memorandum.

### F. The Senators' Letters

In April 2020, Regions received letters from Senators Cory Booker and Sherrod Brown encouraging Regions to stop charging overdraft fees during the COVID-19 pandemic. The Senators sent these letters to other banks too. The Board did not discuss the issues identified in the letter.

This was not the first time that the Company had received correspondence from Senator Booker on this topic. On July 17, 2017, Senator Booker sent a letter to Hall, then-CEO and Chairman of Regions, requesting "detailed information about Regions Bank's practices with respect to overdraft fees."[21] Senator Booker's letter raised specific concerns about the posting methodologies that maximize overdraft fees.

---

[20] Compl., Ex. 20 at RF-BREWER-002890–906.

[21] *Id.*, Ex. 12 at 1.

## G. The Consent Order

In September 2020, the CFPB served Regions with a Civil Investigative Demand ("CID") concerning the Company's overdraft practices. The Audit and Risk Committees discussed the CID. Meeting minutes indicate that the Company was "cooperat[ing]."[22] The minutes do not mention any specific actions taken to adjust its practices to achieve legal compliance.

During a Board meeting on June 21, 2022, Defendant Tara Plimpton, Regions' Senior Executive Vice President and Chief Legal Officer & Corporate Secretary, provided an update on the CFPB investigation. She informed the Board that the CFPB had requested remediation, a civil monetary penalty, and injunctive relief. Plimpton also answered questions about the Company's need to revise its reserves and disclosures related to the CID.

Regions ultimately stipulated to a Consent Order entered on September 28, 2022 (the "2022 Consent Order"). The CFPB summarized the 2022 Consent Order in a press release published that same day, stating that it found that Regions violated the Consumer Financial Protection Act of 2010 and other laws and regulations by using "unintelligible and manipulative processes" to charge consumers $141 million in overdraft fees to accounts with sufficient funds.[23] Regions' violations occurred from at least August 1, 2018 to July 14, 2021.

---

[22] *See id.* ¶ 185, Ex. 28 at RF-BREWER-012522.

[23] *Id.* ¶ 5 (citing *CFPB Orders Regions Bank to Pay $191 Million for Illegal Surprise Overdraft Fees*, CONSUMER FIN. PROT. BUREAU: NEWSROOM (Sept. 28, 2022) *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-regions-bank-pay-191-million-for-illegal-surprise-overdraft-fees (last visited 9/29/25).

11

The 2022 Consent Order states that:

> [Regions] was aware that government agencies previously had found that one or more financial institutions violated the law when they charged these Authorized-Positive Overdraft Fees. [Regions] could have stopped charging these fees sooner, but instead [Regions] continued to charge them for years while it pursued changes to generate alternative fee revenue that would fully offset its expected revenue loss from eventually eliminating the Authorized-Positive Overdraft Fees. Ultimately, [Regions] adopted revenue negative changes that included eliminating the Authorized-Positive Overdraft Fees in July 2021.[24]

In addition, the 2022 Consent Order set guidelines for the Board to follow going forward to ensure compliance, set future deadlines for written compliance progress reports due to the CFPB, and required that Regions create and retain documents demonstrating compliance with the 2022 Consent Order. As part of the settlement, Regions paid a $50 million monetary penalty and provided customer redress of approximately $141 million.[25]

### H. This Litigation

Plaintiff Katherine Brewer has held Regions stock continuously since 1999. On October 26, 2022, Plaintiff served a books and records demand on Regions under 8 *Del. C.* § 220.[26] The Company produced approximately 20,000 pages of confidential

---

[24] *Id.* ¶ 9 (quoting Ex. 2 at 12).

[25] *Id.*, Ex. 1 at 1.

[26] *Id.* ¶ 52.

documents to Plaintiff.[27]   Plaintiff filed this suit derivatively on behalf of nominal defendants Regions Financial Corporation and Regions Bank in December 2023.[28]

Plaintiff names as defendants 22 current or former Regions directors (the "Director Defendants") and five Regions officers (the "Officer Defendants," with the Director Defendants, "Defendants").

Eleven Director Defendants served on the Board for the entirety of the three-year period of wrongdoing: CEO Turner (2018–present), Carolyn H. Byrd (2010–2022), Don Defosset (2005–2022), Samuel A. Di Piazza Jr. (2016–2023), John D. Johns (2011– April 2024), Ruth Ann Marshall (2011–present), Charles D. McCrary (2001–April 2024), James T. Prokopanko (2016–present), Lee J. Styslinger III (2003–present), José S. Suquet (2017–present), and Timoth Vines (2018–present).

Four Director Defendants served on the Board for a portion of the three-year time-period: Eric C. Fast (2010–2020), Zhanna Golodryga (2019–present), Susan W. Matlock (2008–April 2019), and John E. Maupin Jr. (2007–April 2019).

The remaining Director Defendants were either members of the Board only before the alleged wrongdoing occurred or after it ceased: David J. Cooper Sr. (2006–April 2018),  Mark A. Crosswhite (2022–present), Noopur Davis (2022–present), O.B. Grayson Hall Jr. (Former COO and CEO) (2008–July 2018), J. Thomas Hill (2022–

---

[27] *Id.* ¶ 54.

[28] *See id.* ¶ 1.

present), Joia M. Johnson (July 20, 2021[29]–present), and Alison Rand (July 2023–present).[30]

The Officer Defendants comprise: CEO Turner; CFO David J. Turner Jr.; CRO Lusco; COO John B. Owen; and Chief Legal Officer and Corporate Secretary Plimpton.

The Complaint contains two causes of action. In Count I, Plaintiff asserts claims for breach of fiduciary duty under *Massey*[31] and *Caremark*[32] against the Director Defendants. In Count II, Plaintiff asserts claims for breach of fiduciary duty against the Officer Defendants.

---

[29] *See* Dkt. 16 at 34 n.30 (Pl.'s Answering Br.).

[30] Regions' 2025 Annual Proxy Statements states that Johns and McCrary retired from the Board in April 2024. *See* Regions Fin. Corp., Proxy Statement at 65 (Form DEF 14A) (March 3, 2025) ("Mr. Johns and Mr. McCrary retired from the Board effective April 17, 2024."). Regions' 2019 Proxy Statement also states that Defendants Maupin and Matlock retired from the Board in April 2019 (before the Audit Committee's receipt of the Lee Complaint) and that Defendants Cooper and Hall retired in April 2018 and July 2018 (both before the alleged wrongdoing occurred). *See* Regions Fin. Corp., Proxy Statement (Form DEF 14A) (Mar. 8, 2019) ("Susan Matlock and John Maupin, who are retiring from [Regions'] Board in April [2019], having reached the mandatory retirement age."); *id.* ("In July 2018, . . . Grayson Hall retired[.]"); *id.* at 96 (indicating that Cooper only served on the Board until "April 25, 2018"). Under D.R.E. 201, the court may judicially notice a fact that is not subject to reasonable dispute. *See* D.R.E. 201. The court thus takes judicial notice of Johns's and McCrary's April 2024 retirement, Matlock's and Maupin's April 2019 retirement, Cooper's April 2018 retirement, and Hall's July 2018 retirement for purposes of deciding the motion to dismiss.

[31] 2011 WL 2176479 (Del. Ch. May 31, 2011).

[32] 698 A.2d 959 (Del. Ch. 1996).

14

On March 1, 2024, Defendants moved to dismiss the Complaint.[33] The parties completed briefing the motion on August 14, 2024,[34] and the court heard oral argument on January 22, 2025.[35]

## II.  LEGAL ANALYSIS

Plaintiff's claims are derivative, and Defendants have moved to dismiss them under Rule 23.1 for failure to plead demand futility.  Defendants have also moved to dismiss under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

### A.  Demand Futility

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[36]  "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and

---

[33] Dkts. 9–11.

[34] Dkt. 21.

[35] Dkt. 31.

[36] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review.  *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814).  The *Brehm* court held that, going forward, appellate review of a Rule 23.1 determination would be de novo and plenary.  746 A.2d at 253–54.  The seven partially overruled precedents otherwise remain good law.  This decision does not rely on any of them for the standard of appellate review.  Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

15

assert the corporation's claim."[37]  Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[38]  The demand requirement is a substantive principle under Delaware law.[39]

Rule 23.1 is the "procedural embodiment" of the demand requirement.[40]  Under Rule 23.1, a derivative complaint must "state with particularity: . . . any effort by the derivative plaintiff to obtain the desired action from the entity; and . . . the reasons for not obtaining the action or not making the effort[.]"[41]

A stockholder can satisfy the demand requirement by pleading that demand is futile.  To plead demand futility, the complaint must allege "particularized factual statements that are essential to the claim."[42]  Although the requirement of factual particularity is a heightened pleading requirement, it "does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations."[43]  If a plaintiff pleads

---

[37] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[38] *Id.*

[39] *Id.*; *see* Ct. Ch. R. 23.1(a).

[40] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[41] Ct. Ch. R. 23.1(a)(1).

[42] *Brehm*, 746 A.2d at 254.

[43] *Zuckerberg*, 250 A.3d at 877.

16

particularized facts, those factual allegations "are accepted as true" and "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged[.]"[44]

In *Zuckerberg*,[45] the Delaware Supreme Court adopted the "universal test" for demand futility that blends elements of the two precursor tests: *Aronson*[46] and *Rales*.[47] When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[48]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[49] Although the *Zuckerberg*

---

[44] *Id.* (citing cases).

[45] 262 A.3d 1034.

[46] 473 A.2d 805.

[47] 634 A.2d 927.

[48] *Zuckerberg*, 262 A.3d at 1059.

[49] *Id.*

17

test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[50]

The demand analysis is conducted as to the board in place at the time that the claims at issue were "validly in litigation."[51] This rule protects representative plaintiffs by preventing defendants from recomposing a board after a derivative claim is filed to strengthen Rule 23.1 arguments.[52]

The Board in place when Plaintiff filed the Complaint comprised the following fourteen Director Defendants: Crosswhite, Davis, Golodryga, Hill, Johns, Johnson, Marshall, McCrary, Prokopanko, Styslinger, Suquet, J. Turner, Vines, and Rand (the "Demand Board").[53] To adequately allege demand futility, Plaintiff must plead

---

[50] *Id.* In 2023, the Court of Chancery amended its rules to reflect the Delaware Supreme Court's adoption of the *Zuckerberg* test and modernize the language and presentation of the Rules to bring them closer in style to the Federal Rules of Civil Procedure. *See In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).

[51] *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006).

[52] *See Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) ("When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one."); *Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chi. v. Smith*, 2016 WL 3223395, at *10 (Del. Ch. May 31, 2016) (describing as "problematic" a situation "where a manipulation of board composition is employed to discourage meritorious derivative litigation"), *aff'd sub nom. Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chi. ex rel. BioScrip, Inc. v. Smith*, 175 A.3d 621 (Del. 2017) (TABLE).

[53] Compl. ¶ 247.

18

particularized facts creating reason to doubt that at least seven of the fourteen Demand Board members were incapable of impartially considering a demand.[54]

Plaintiff's primary *Zuckerberg* theory is that nine of the Demand Board members, who were on the Board between August 2018 and July 2021, face a substantial likelihood of liability from the claims asserted in the derivative complaint.[55]  Those individuals are Turner, Golodryga, Johns, Marshall, McCrary, Prokopanko, Styslinger, Suquet, and Vines.  Where, as here, a plaintiff's basis for arguing demand futility centers on a substantial likelihood of liability resulting from the derivative claims at issue, the demand analysis effectively folds into an analysis of the strength of the underlying claims as to the Demand Board members.  In this case, therefore, the *Zuckerberg* analysis hinges on whether Plaintiff has stated a claim under Rule 12(b)(6) against the Demand Board members.

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[56]  When considering such a motion, the court must

---

[54] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989–90 (Del. Ch. 2007) ("Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.").

[55] Plaintiff also raises first and third prong *Zuckerberg* arguments in her Complaint. *See* Compl. ¶¶ 273–80.  In briefing, however, Plaintiff's only mention of those arguments is found in a footnote stating that Plaintiff "stands on her pleadings with respect to her material benefits and lack of independence claims."  Pl.'s Answering Br. at 54 n.39.  A party must brief arguments to avoid waiving them. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived." (first citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993); and then citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 n.3 (Del. 1997))).  Plaintiff waived these arguments by failing to develop them in briefing.

[56] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

"accept all well-pleaded factual allegations in the [c]omplaint as true, . . .draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[57] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[58]

Under the umbrella of Count I, Plaintiff advances theories of liability under both *Caremark*[59] and *Massey*.[60] Plaintiff's strongest theory is *Caremark*, where this analysis focuses.

A *Caremark* claim "seeks to hold directors accountable for the consequences of a corporate trauma[.]"[61] *Caremark* describes the test as requiring that the directors "knew or . . . should have known" about the risk leading to the trauma.[62] *Stone* clarified that liability under *Caremark* requires a showing of bad faith—"that the

---

[57] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[58] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by*, *Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[59] 698 A.2d 959.

[60] 2011 WL 2176479.

[61] *La. Mun. Police Empls.' Ret. Sys. v. Pyott,* 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *see also Horman v. Abney*, 2017 WL 242571, at *5 (Del. Ch. Jan. 19, 2017) ("*Caremark* claims inevitably arise in the midst of or directly following 'corporate trauma' of some sort or another."); *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *7 (Del. Ch. Aug. 1, 2016) (quoting *Pyott*, 46 A.3d at 340), *aff'd*, 158 A.3d 449 (Del. 2017).

[62] *Caremark*, 698 A.2d at 971.

directors knew that they were not discharging their fiduciary obligations."[63] At the pleading stage, the plaintiff must allege facts from which the court can reasonably infer that a fiduciary acted in bad faith.[64]

*Stone* identified two subspecies of *Caremark* claims. To state a *Caremark* claim, a plaintiff must allege particularized facts that establish either (1) "the directors utterly failed to implement any reporting or information system or controls, *or* [(2)] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[65] These two subspecies are colloquially referred to as prong-one and prong-two theories, or information-systems and red-flags theories.[66]

Plaintiff advances both an information-systems theory and a red-flags theory, but the information-systems theory can be addressed in short order. The 220 Documents, and the Complaint generally, reflect that multiple Board committees were tasked with risk management covering laws and regulations governing

---

[63] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Pyott*, 46 A.3d at 340–41 (discussing the "actual knowledge" requirement of *Caremark*).

[64] *Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019) (quoting *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007)).

[65] *Stone*, 911 A.2d at 370 (emphasis in original).

[66] *See In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 359–60 (Del. Ch. 2023) (labeling first species of claims as "information-system" claims and second species as "red-flags" claims).

overdraft fees.[67]  There is no straight-faced argument that Regions lacked an information system.  This analysis thus focuses on Plaintiff's red-flags theory.

To adequately allege a red-flags theory, a plaintiff must plead "particularized facts that the board knew of red flags but consciously disregarded them in bad faith."[68]  "[A] *Caremark* plaintiff can plead that 'the directors were conscious of the fact that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in defiance of their duties."[69]  A claim that a board "had notice of serious

---

[67] *See* Compl., Ex. 3 at RF-BREWER-012059, RF-BREWER-012109–114 (July 2021 Risk Committee minutes and materials detailing implementation and progress of the Customer Transparency Project for developing compliant overdraft practices); *id.* ¶¶ 14, 124, 206, Ex. 6 at RF-BREWER-001757 (October 2019 joint Risk and Audit Committee meeting minutes discussing progress of Customer Transparency Project and planned implementation of changes to Regions' overdraft practices that were in line with the July 2018 Bulletin's guidance); *id.* ¶¶ 14, 125, 169, 212 n.64, Ex. 7 at RF-BREWER-002806–07 (December 2019 Audit Committee meeting minutes in which Buckley made a presentation updating the committee on the customer transparency initiative and its implementation that would bring Regions' overdraft practices in line with the July 2018 Bulletin); *id.* ¶¶ 15, 147, 150, 208, Ex. 8 at RF-BREWER-000446 (February 2019 minutes of meeting between Risk Committee and Regions Bank's board of directors discussing the USAA Consent Order and, in response to that consent order, expanding the Customer Transparency Working Group's role to also include reviewing Regions' overdraft practices); *id.* ¶¶ 15, 125, 169, 212 n.66, Ex. 9 at RF-BREWER-004563 (December 2019 Board meeting minutes in which the Audit Committee chair informed the Board that the committee was satisfied with the customer transparency initiative and that changes to Regions' overdraft practices would occur within 14–18 months); *id.* ¶¶ 17, 175, 216, Ex. 10 at RF-BREWER-006532 (September 2020 Board meeting minutes discussing overdraft policy changes implemented as part of the customer transparency initiative and informing the Board that Regions received the CID from CFPB regarding its overdraft practices).

[68] *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020).

[69] *David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006) (footnote omitted).

22

misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning."[70] The intuitive notion underlying the red-flags theory is that "sophisticated and well-advised individuals like corporate directors do not customarily concede violations of positive law," and so "a plaintiff must plead facts and circumstances sufficient for a court to infer" this conduct.[71]

For a red-flags theory to work, the red flag must be sufficiently connected to the corporate trauma at issue to elevate the board's inaction in the face of the red flag to the level of bad faith. The relationship between the red flag and the corporate trauma cannot be too attenuated.[72] Former Vice Chancellor Glasscock has described the requirement as one of "proximate cause," stating that "the corporate trauma in question must be sufficiently similar to the misconduct implied by the red flags such that the board's bad faith, conscious inaction proximately caused that trauma."[73] The question at the pleading stage is whether it is reasonably conceivable that the identified red flag would have placed a reasonable observer on notice of the risk of the corporate trauma that ensued.

---

[70] *Id.*

[71] *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012); *see also In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015) (observing that red flags "are a proxy for pleading knowledge").

[72] *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010).

[73] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *15 (Del. Ch. Dec. 18, 2017) (internal quotation marks omitted) (quoting *Jacobs*, 2016 WL 4076369, at *8).

In support of its red-flags theory, Plaintiff alleges that Regions unlawfully charged overdraft fees from August 2018 through mid-July 2021 on transactions that had a sufficient balance at the time of authorization but then later settled with an insufficient balance, and Regions paid $191 million as a result.[74] Plaintiff further alleges that the Board ignored warnings that the Company's overdraft policies and practices were illegal and, in doing so, caused the corporate trauma.

Plaintiff identifies a slew of public information that supposedly constitutes red flags. A piece of information can only support a red-flag claim, however, if it is reasonably conceivable that the Board learned of it. "[R]ed flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'"[75] A plaintiff must plead the existence of red flags that "should have put the director defendants on notice of the offensive conduct or the weakness of the corporation's internal controls."[76]

Plaintiff does not adequately allege that the Board learned of all the information that Plaintiff calls red flags. For example, Plaintiff pleads the existence of the 2016 interagency webinar and the 2019 FDIC publication. Plaintiff also pleads that, before Regions adopted its illegal overdraft practices, many national banks entered settlements or were found liable for millions of dollars because of their

---

[74] Compl., Ex. 1 at 1.

[75] *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) (quoting *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003), *aff'd sub nom.*, *Rabinovitz v. Shapiro*, 839 A.2d 666 (Del. 2003).

[76] *Citigroup*, 2003 WL 21384599, at *2.

overdraft practices. The publicly available information concerning the illegal nature of Regions' overdraft procedures bolsters inferences drawn from information that the Board actually reviewed. But these pieces of information are not red flags unto themselves.

Plaintiff identifies three categories of information that the Board reviewed: the Senators' Letters; the USAA Federal Savings Bank Consent Order and July 2018 Bulletin; and the Lee Complaint. Plaintiff also pleads the existence of the 2022 Consent Order and its findings based on the CFPB's investigation to support inferences that the Board ignored red flags.

It is not reasonable to construe the Senators' Letters as red flags. Even if it were reasonable to infer that the Board read the Senators' Letters, their content presents no cause for alarm. Senator Booker's July 2017 letter requested information about Regions' practices concerning overdraft fees, and it came before Regions adopted the illegal policy.[77] And Regions was one of fifteen banks to receive April 2020 letters, which encouraged recipients to stop charging overdraft and non-sufficient fund fees during the Coronavirus pandemic.[78] This humanitarian plea does not threaten regulatory action or otherwise claim that Regions violated positive law. It is not fair to infer that the letters would have placed the Board on notice of risks associated with Regions' overdraft policy.

---

[77] *See* Compl. ¶ 65 (stating that the illegal overdraft policy began on August 1, 2018).
[78] *See id.* ¶ 172.

Although the 2019 USAA Federal Savings Bank Consent Order and July 2018 Bulletin carry greater significance, a close read of those documents dispels any allegation that they were red flags of the overdraft practices at issue. The USAA Consent Order was primarily based on violations of the Electronic Fund Transfer Act and its implementing Regulation E.[79] USAA failed to honor consumers' stop payment requests and failed to initiate and complete reasonable error resolution investigations. These practices caused consumers to receive negative balances and incur overdraft and non-sufficient fund fees. The CFPB also found that USAA violated the CFPA, but because USAA unfairly reopened accounts its customers had closed, subjecting them to unexpected fees, including overdraft fees.[80] The USAA Consent Order thus did not address violations like those of Regions.

The USAA Consent Order, however, prompted the Board to discuss the July 2018 Bulletin, which does address illegal overdraft fees covered by the 2022 Consent Order. The USAA Consent Order, therefore, surfaced information to the Board that should have informed the Board of problems with Regions' overdraft practices. Still,

---

[79] *See In re USAA Fed. Sav. Bank*, CFPB No. 2019-BCFP-0001 ¶ 1 (Jan. 3, 2019). Although the USAA Consent Order is not attached to the Complaint, the court may consider it in ruling on Defendants' motion to dismiss. "While matters outside the pleadings should not generally be considered in ruling on a motion to dismiss, the court may properly consider documents 'integral to a plaintiff's claim and incorporated in the complaint.'" *Latesco*, 2009 WL 2246793, at *1 n.1 (quoting *Santa Fe*, 669 A.2d at 69). Plaintiff refers to the USAA Consent Order several times, characterizing it as one of the red flags on which her prong two claim is based. *See* Compl. ¶¶ 146–51. The USAA Consent Order is integral to the Complaint and the court may consider it in deciding Defendants' motion to dismiss.

[80] *See In re USAA*, CFPB No. 2019-BCFP-0001, ¶¶ 33–40.

it is difficult to conclude that the July 2018 Bulletin, standing alone, constituted a red flag. The July 2018 Bulletin, however, did not stand alone.

Plaintiff's most powerful red flag is the Lee Complaint. Lee was Regions' General Counsel. His job included identifying legal risks. The Audit Committee received a copy of the Lee Complaint in November 2019.[81] Given Lee's former position at the Company, it is reasonable to infer that the Board was made aware of the Lee Complaint and its contents.

According to Lee, he had advised management that Regions' overdraft policy did not comply with federal regulation.[82] Lee explained based on CFPB guidance that charging an overdraft fee on an authorized signature-based point-of-sale transaction that settles into a negative balance violated Section 5 of the FTC Act.[83] Lee claimed that the Customer Transparency Working Group formed in November 2018 was not empowered to stop the illegal overdraft practices.[84] Lee further stated that Regions executives avoided resolving the issues and achieving compliance with applicable law and regulations pertaining to overdraft fees and posting order. For example, Executive Vice President Scott Peters hired outside consultant Ankura to review Regions' posting order and develop a plan for how Regions could *increase* its fee revenue even if it stopped collecting the illegal fees.[85] And at an Executive

---

[81] *See* Compl. ¶ 152, Ex. 17 at RF-BREWER-002765.

[82] *See id.*, Ex. 4 ¶ 1.

[83] *See id.*, Ex. 4 ¶ 29.

[84] *See id.*, ¶ 157, Ex. 4 ¶ 30.

[85] *See id.*, Ex. 4 ¶ 33.

27

Leadership Team meeting in July 2019, CEO Turner approved a plan to continue collecting the illegal fees, according to Lee.[86]

Given its contents, it is reasonably conceivable that the Lee Complaint alerted the Board to the illegal nature of Regions' overdraft fee practice. It is also reasonably conceivable that, after receiving the Lee Complaint, the salience of the July 2018 Bulletin became evidence. And it is reasonable to infer that, had the Board cut off illegal overdraft practices when it received the Lee Complaint, then Regions could have mitigated the damages paid under or avoided the 2022 Consent Order altogether.

The remaining aspect of this analysis asks whether the Board failed to act in good faith in response to the red flag. This is reasonably conceivable. As Defendants note, the Board's primary response to the Lee Complaint was to hire Buckley. Plaintiff does not allege any details concerning the nature of Buckley's advice—nor could she, because Regions redacted the substance of Buckley's memorandum when providing it to Plaintiff. Hiring counsel to advise regulatory risk is a good thing. But if merely hiring *an* attorney to look into *something* were sufficient to avoid inferences of bad faith under *Caremark*, then *Caremark* would be the "chimera" our high court has disclaimed.[87] Merely hiring an attorney in response to a red flag, therefore, does not provide the absolution Defendants seek.

---

[86] *See id.*, Ex. 4 ¶ 34.

[87] *Marchand*, 212 A.3d at 824.

28

Defendants argue that the Board did response to the red flag, just not on Plaintiff's preferred timeline. They say that, a month before receiving the Lee complaint, the Board expanded the scope of the Customer Transparency Working Group to address overdraft issues. Defendants contend that the Board had resolved, as of October 2019, to change the policy; they just did not do so quickly enough. According to Defendants, that is not inaction; that is merely delay. Defendants say that Plaintiff's "delay theory" fails as a matter of law. That is, delay can never constitute bad faith.

Defendants' mere-delay defense does not jive with a basic understand of human nature. Everyone knows that delay can be intentional and a tactic to avoid the consequences of acting appropriately. The CFPB findings illustrate the point. The CFPB found that Regions "could have stopped charging these fees sooner, but instead . . . continued to charge them for years while it pursued changes to generate alternative fee revenue that would fully offset its expected revenue loss from eventually eliminating the [illegal fees]."[88] The Lee Complaint made similar allegations, stating that Regions did "not stop collecting the illegal fees until [it could] implement the new posting order plan in approximately November of 2020" because it "did not want to take the revenue hit."[89] Consciously delaying actions that a Board knows to be illegal supports an inference of bad faith.

---

[88] Compl., Ex. 2 at 2 ¶ 2.

[89] *Id*., Ex. 4 at RF-BREWER-002778.

29

Defendants' authorities do not support their delay defense or treating delay as good faith as a matter of law. Defendants cite to *In re McDonald's Corporation Stockholder Derivative Litigation*, which involved allegations that one of America's "largest employers" had "ignored red flags about a corporate culture that condoned sexual harassment and misconduct."[90] The court dismissed the red-flags claim against the defendant directors (and ultimately dismissed the entire complaint under Rule 23.1) because the plaintiff failed to plead bad faith. As the court observed, after the board became aware of the culture of sexual harassment, management reported to a board committee concerning extensive efforts to correct the company culture.[91] This clear shift from "business-as-usual" to a proactive mode made it unreasonable to infer that the directors ignored red flags in bad faith.[92] In contrast with the proactive change-in-gears present in *McDonald's*, the CFPB found that Regions could have eliminated illegal overdraft fees but intentionally delayed. *McDonald's* does not aid Defendants.[93]

---

[90] 291 A.3d 652, 664, 661 (Del. Ch. 2023).

[91] *Id.* at 683 (noting: "The adoption of an updated anti-harassment policy. Retaining RAINN to advise the Company. A holistic review of the Company's training programs. The retention of Seyfarth Shaw at Work to design new and additional training programs. A new hotline for employees at franchise restaurants. A shared values commitment to be signed by franchisees. A franchisee guide containing best practices and recommendations on establishing and maintaining a safe and respectful workplace. A cultural assessment, including listening sessions to promote continuous improvement. An end to the Company's previous policy requiring mandatory arbitration of harassment and discrimination claims as a condition of employment.") (bullets in original).

[92] *Id.*

[93] Defendants' other delay-theory authorities are similarly inapposite. *See Firemen's Ret. Sys. St. Louis v. Sorenson*, 2021 WL 4593777, at *13–16 (Del. Ch. Oct. 5, 2021)

Defendants also discredit the Lee Complaint. They note that Regions' CEO viewed Lee as someone who "create[d] problems."[94] And Lee's claims for whistleblowing were mixed in with unusual allegations of reverse gender discrimination. According to Defendants, these facts combined with the fact the Board sought legal advice in response to the red flag at issue undermines any inference of bad faith. Defendants make good points that might ultimately prevail. But the court cannot weigh these factual assertions against Plaintiff's well-pled allegations at the pleading stage.

In sum, nine of the fourteen Demand Board members face a substantial likelihood of liability under *Caremark*. It is therefore reasonably conceivable that they are incapable of impartially considering a demand to pursue Plaintiff's *Caremark* claims. Because it is reasonably conceivable that more than half of the Demand Board is conflicted under *Zuckerberg*, demand is excused as futile.

Because Plaintiff's red-flags theory is successful, the court need not consider the *Massey* Theory for purposes of the demand futility analysis. Defendants' motion to dismiss under Rule 23.1 is denied.

---

(dismissing *Caremark* claims based on board's alleged failure to implement adequate cybersecurity systems, where the alleged failure concerned non-binding industry standards and not positive law, and where the board immediately took measures to implement changes mitigating the company's cybersecurity vulnerabilities when it learned of them); *Clem v. Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) (dismissing *Caremark* claim based on a company's alleged violations of federal health care billing laws where the DOJ's CID did not accuse the company of violating the law, and the board met several times after receiving the CID to oversee the implementation of changes to insulin billing practices as well as the company's response to the CID).

[94] *Id.*, Ex. 4 at RF-BREWER-002766.

## B. Failure To State A Claim

As discussed above, Defendants J. Turner, Golodryga, Johns, Marshall, McCrary, Prokopanko, Styslinger, Suquet, and Vines face a substantial likelihood of liability under Plaintiff's red-flags theory. The Complaint states a claim against them, and the Rule 12(b)(6) motion as to those Defendants is denied. That leaves the Rule 12(b)(6) motion filed by the remaining Director Defendants and the Officer Defendants.

### 1. The Director Defendants

Defendants Di Piazza, Byrd, Cooper, DeFosset, Fast, Hall, Matlock, and Maupin left the Board before Plaintiff filed the Complaint, so they are not Demand Board members.

Cooper and Hall left the Board in 2018, the year when Regions adopted the illegal policy, but before the Board received the Lee Complaint or discussed the USAA Consent Order. It is not reasonably conceivable that Cooper and Hall consciously ignored red flags they did not see.[95]

Matlock and Maupin left the Board in April 2019, after the Board discussed the USAA Consent Order but before the Lee Complaint. As discussed above, receipt of the USAA Consent Order standing alone does not support a claim under *Caremark*. And they too could not consciously ignore red flags raised in the Lee Complaint

---

[95] That Senator Booker's 2017 letter was sent to Defendant Hall does not alter the analysis with respect to him. He was not on the Board during the period of wrongdoing.

months after they retired from the Board. Plaintiff fails to plead a reasonably conceivable *Caremark* claim against Matlock and Maupin.

Di Piazza and Byrd were on the Board during the period of wrongdoing. They also served on the Audit Committee, which received a copy of the Lee Complaint, reviewed the July 2018 Bulletin during a December 2019 meeting, and met with Buckley in December 2019 to discuss the firm's findings. It is reasonably conceivable that Di Piazza and Byrd knew of and failed to adequately respond to these red flags.

Defosset was on the Board during the period of wrongdoing and was a member of the Risk Committee but not the Audit Committee. It is reasonably conceivable, however, that the entire Board was made aware of the Lee Complaint and failed to take action.

Fast left the Board in 2020, partway through the period of wrongdoing but after the Lee Complaint. Fast served on the Audit and Risk Committees. Given the red flags that these committees should have known of and failed to respond to before or during 2020, it is reasonably conceivable that Fast knew of and failed to adequately respond to these red flags.

Defendants Johnson, Crosswhite, Hill, Davis, and Rand joined the Board after the alleged wrongdoing ceased (*i.e.*, July 2021). Plaintiff argues that those directors breached their fiduciary duties by failing to take remedial action against their fellow

directors for their prior conduct, but she does not meaningfully develop this argument or cite to any supporting authorities.[96]

Defendants' motion to dismiss is denied as to Defendants Di Piazza, Byrd, Defosset, and Fast. Defendants' motion to dismiss is granted as to Defendants Cooper, Hall, Matlock, Maupin, Johnson, Crosswhite, Hill, Davis, and Rand.

### 2. The Officer Defendants

Defendants argue that the allegations in the Complaint fall short of establishing a claim against the Officer Defendants. Plaintiff failed to brief any response. Plaintiff waived its claims against the Officer Defendants by failing to defend them in her Answering Brief.[97]

## III. CONCLUSION

Count I is dismissed as to Defendants Cooper, Hall, Matlock, Maupin, Johnson, Crosswhite, Hill, Davis, and Rand. Count II is dismissed in its entirety. Defendants' motion to dismiss is otherwise denied.

---

[96] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *47 (Del. Ch. Jan. 27, 2021), is inapposite. In *CBS*, the court held a director "is deemed unfit to consider a demand to pursue" claims against her co-defendants where she herself faces a substantial likelihood of liability for claims based on "congruous" factual allegations. *See id.* at *47. Plaintiff alleges no congruous facts here.

[97] *See Emerald P'rs*, 726 A.2d at 1224 (holding that issues not briefed are deemed waived).